IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BLUEFIELD DIVISION

| | | |
|---|---|---|
| DOROTHY SUE SPEARS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:12-00638 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security

denying Plaintiff's application for Supplemental Security Income (SSI), under Title XVI of the

Social Security Act, 42 U.S.C. §§ 1381-1383f. This case is presently pending before the Court on

the Plaintiff's Motion for Judgment on the Pleadings (Document No. 16.) and Motion for Remand

(Document No. 19.), Defendant's Motion for Judgment on the Pleadings (Document No. 21.), and

Plaintiff's Response. (Document No. 22.) Both parties have consented in writing to a decision by

the United States Magistrate Judge. (Document Nos. 3 and 4.)

The Plaintiff, Dorothy Sue Spears (hereinafter referred to as "Claimant"), filed an application

for SSI on September 12, 2008 (protective filing date), alleging disability as of December 1, 2003,

due to "brain lesion, stroke, diabetes, asthma, severe depression, mental problems, [and] high blood

pressure."[1] (Tr. at 12, 122-24, 141, 157.) The claim was denied initially and upon reconsideration.

(Tr. at 55-57, 71-73.) On June 10, 2009, Claimant requested a hearing before an Administrative Law

---

[1] On her form Disability Report - Appeal, Claimant alleged as additional disabling
impairments audible hallucinations, foot and ankle problems, tiredness, shortness of breath, nerve
problems, an inability to sleep, speech difficulties, and a possibility of brain surgery. (Tr. at 197,
207.)

Judge (ALJ). (Tr. at 76-78.) The hearing was held on August 31, 2010, before the Honorable Joseph T. Scruton. (Tr. at 27-52.) By decision dated September 24, 2010, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 12-21.) The ALJ's decision became the final decision of the Commissioner on January 24, 2012, when the Appeals Council denied Claimant's request for review. (Tr. at 1-5.) On March 2, 2012, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2010). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain

v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2010). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> (C) *Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of

the Listings of Impairments.

> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since September 12, 2008, the application date. (Tr. at 14, Finding No. 1.) Under the second inquiry, the ALJ found that Claimant suffered from "degenerative disc disease of the lumbosacral spine, history of scoliosis and facet hypertrophy, status post possible light stroke in 2008, obesity, major depressive disorder, post-traumatic stress disorder, generalized anxiety disorder, and mild mental retardation," which were severe impairments. (Tr. at 14, Finding No. 2.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 14, Finding No. 3.) The ALJ then found that Claimant had a residual functional capacity to perform sedentary exertional work, as follows:

> [T]he [C]laimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except for that which involves exposure to dust, odors, fumes, pulmonary irritants, wetness, or extremes of temperature or humidity; requires following more than short, simple instructions; or involves more than occasional interaction with supervisors, co-workers, or the public.

(Tr. at 16, Finding No. 4.) At step four, the ALJ found that Claimant was unable to return to her past

relevant work. (Tr. at 20, Finding No. 5.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ also concluded that Claimant could perform jobs such as an assembler, an inspector/tester, and a packer, at the sedentary level of exertion. (Tr. at 20-21, Finding No. 9.) On this basis, benefits were denied. (Tr. at 21, Finding No. 10.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is not supported by substantial evidence.

Claimant's Background

Claimant was born on July 14, 1973, and was 37 years old at the time of the administrative hearing, August 31, 2010. (Tr. at 20, 122.) Claimant had a high school education and was able to communicate in English. (Tr. at 20, 157, 166.). In the past, Claimant worked as a dispatcher,

certified nursing assistant, and telemarketer. (Tr. at 20, 158-60, 168-77.)

 The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence, and will discuss it below in relation to Claimant's arguments.

***Bluestone Health Center***:

On September 13, 2007, Claimant's chief complaint to Dr. Mark Clarkson, D.O., was depression and anxiety. (Tr. at 330.) Dr. Clarkson noted that Claimant was being treated by Dr. Hasan and had no plans of returning to work and that she stated she was not able to perform any type of work at that time. (Id.) Dr. Clarkson noted very poor dentition but that otherwise, Claimant had no significant abnormalities. (Id.) Dr. Clarkson also completed a form General Physical (Adults) for the Department of Health and Human Resources on September 13, 2007, on which he noted Claimant's statement of disability to include depression and anxiety. (Tr. at 232-26.) Dr. Clarkson noted the major diagnoses as depression and anxiety and noted that per Claimant's statements, Dr. Hasan had not released her to return to work and that she did not know if she would ever return to work. (Tr. at 324-25.) He noted that Claimant should avoid high stress and crowded environment work situations. (Id.)

***New Hope Psychiatric Associates - Nusrath Hasan, M.D. & Deborah Nolley, M.S.***:

Dr. Hasan's handwriting is difficult to decipher, but it appears that the record reflects Claimant's treatment with her from January 4, 2000, through April 7, 2009. (Tr. at 668-87, 787-89, 841-45.) Treatment was consistent through 2000, then it ceased until December 30, 2004. (Tr. at 676-86.) Claimant then sought treatment on February 9 and August 8, 2005, October 24, 2006, and May 29 and November 3, 2007. (Tr. at 677, 684, 687, 681.) Treatment then resumed treatment consistently on January 4, 2008, through April 7, 2009. (Tr. at 668-69, 671-75, 678, 787-89, 841-

43.) Dr. Hasan's treatment notes consistently reflected Claimant's complaints of depression and anxiety and Dr. Hasan's observations of deficient mood and affect and poor concentration and memory. (Tr. at 668-87, 787-89, 841-45.)  Nevertheless, Dr. Hasan's treatment notes consistently reflected that Claimant was oriented to time, place and person; exhibited coherent speech, had good general knowledge, reality testing, insight, and judgment; and had intact recent and remote memory. (Id.) Claimant consistently denied suicidal and homicidal ideation, as well as delusions and hallucinations. (Id.)

On July 18, 2007, Dr. Hasan completed a form Physician's Summary for the Department of Health and Human Resources, on which she indicated a diagnosis of major depression and that Claimant's prognosis was poor. (Tr. at 230-31.) She opined that Claimant was unable to be gainfully employed. (Tr. at 230.)

Claimant also treated with Ms. Nolley, a psychologist at New Hope Psychiatric Associates, beginning on January 14, 2008. (Tr. at 696-89, 875-80.) Ms. Nolley noted that Claimant had not been seen for psychotherapy for a couple of months due to what Claimant termed as "chaos at home." (Tr. at 696.) Claimant explained that she had become depressed and had thoughts of suicide, without plan or intent of acting through. (Id.) Claimant discussed her feelings with a friend, which provided emotional support to her at that time. (Id.) Dr. Nolley noted that Claimant had a mildly depressed mood and affect, but was cooperative with coherent speech, intact memory and cognition, and normal thought processes. (Id.) Claimant denied suicidal or homicidal ideation and delusions or hallucinations. (Id.)

On February 4, 2008, Claimant reported continued family stress, but denied any suicidal or homicidal ideation, intent, or plan. (Tr. at 695.) Claimant's mood was mildly depressed and her affect was constricted, but she was cooperative, her speech was coherent, her memory and cognition

was intact, and her thought processes were within normal limits. (Id.) She reported on March 5, 2008, that she was stressed about her father's health and tried to cope with the stress by attending church. (Tr. at 694.) Claimant told Ms. Nolley about her self-esteem problems and feelings of insecurity, as well as sleep problems. (Id.) Claimant denied suicidal or homicidal ideation and delusions or hallucinations. (Id.) Her mood was depressed and her affect was constricted, but she continued to be cooperative, with intact memory and cognition, coherent speech, and normal thought processes. (Id.)

On April 30, 2008, Ms. Nolley noted that Claimant appeared less depressed and anxious and noted her reports that her father's medical condition had improved. (Tr. at 693.) Claimant denied suicidal or homicidal ideation and hallucinations or delusions. (Id.) Claimant reported that she was doing better since she was last seen. (Id.) She was cooperative and exhibited coherent speech, intact memory and cognition, and normal thought processes. (Id.) Claimant reported on May 28, 2008, that her condition was not that bad. (Tr. at 692.) She reported some decrease in family stress, although she indicated difficulty falling asleep and awaking after only a few hours of sleep. (Id.) Ms. Nolley noted that Claimant was less depressed, but appeared anxious. (Id.) She noted that she was cooperative, denied suicidal or homicidal ideation, had no hallucinations or delusions, had intact memory and cognition, and had normal thought processes. (Id.)

On July 1, 2008, Claimant reported that she was stressed because her father was hospitalized and because she had conflict with her sister. (Tr. at 691.) She reported difficulty sleeping and that she was depressed, but Ms. Nolley noted that she was cooperative with coherent speech, intact memory and cognition, and normal thought processes. (Id.) Claimant denied suicidal or homicidal ideation and hallucinations or delusions. (Id.) On August 18, 2008, Claimant reported that her father had died. (Tr. at 690.) She also reported that her family was not supportive and that she had failed

9

to take her prescribed medication for the past two months due to the cost of the co-pay for her medications. (Id.) Ms. Nolley noted that Claimant was depressed and tearful, denied suicidal or homicidal ideation, but was cooperative and exhibited coherent speech and intact memory and cognition. (Id.)

On October 20, 2008, Claimant reported that she had to move because she could not afford the mortgage and was displeased with the move. (Tr. at 689.) She also had not taken her medications as she was unable to afford the co-pay. (Id.) She reported having experienced three panic attacks and that she went to the emergency room on two occasions, due to chest pain. (Id.) She denied suicidal or homicidal ideation and hallucinations or delusions. (Id.) Ms. Nolley noted that Claimant's mood was depressed and her affect was constricted, but she was cooperative, with coherent speech, intact memory and cognition, and normal thought processes. (Id.)

Claimant apparently moved out of the area and did not see Ms. Nolley again until May 3, 2010, approximately one and a half years later, at which time Ms. Nolley conducted a psychological interview. (Id. at 878-80.) Claimant reported a long-standing history of depression and anxiety, with crying episodes, sleep and appetite disturbance, and panic attacks. (Tr. at 878.) Ms. Nolley observed that Claimant appeared sickly and had a depressed mood and constricted affect. (Tr. at 879.) Nevertheless, she was cooperative and exhibited appropriate behavior, normal speech, goal-directed thought processes, and normal thought content. (Id.) She denied suicidal or homicidal ideation, as well as hallucinations at that time, though she had experienced auditory and visual hallucinations in the past. (Id.) Ms. Nolley diagnosed dysthymic disorder, panic disorder without agoraphobia, personality disorder NOS, and assessed a GAF of 70.[3] (Tr. at 880.) She referred Claimant to

_____

[3] The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 61-70 indicates that the person has some mild

Southern Highlands for medication management. (Id.)

On June 22, 2010, Claimant reported an increase in nightmares and visual hallucinations. (Tr. at 877.) She denied suicidal and homicidal ideation, intent, or plan. (Id.) Ms. Nolley noted that she was anxious, but was cooperative, with coherent speech, and normal thought processes. (Id.) On July 6, 2010, Claimant discussed with Ms. Nolley her childhood trauma and asserted that her nightmares had increased. (Tr. at 876.) She explained that her niece's upcoming birthday was prompting her to "relive" childhood memories. (Id.) She was depressed and tearful but denied suicidal or homicidal ideation, intent, or plan, and hallucinations or delusions. (Id.) She exhibited cooperative behavior, coherent speech, intact memory and cognition, and normal thought processes. (Id.) On July 27, 2010, Claimant continued to struggle with issues from her childhood and family stress, but denied suicidal or homicidal ideation, intent, or plan, and delusions or hallucinations. (Tr. at 875.) Her mood was depressed and her affect was constricted, but she exhibited cooperative behavior, coherent speech, intact memory and cognition, and normal thought processes. (Id.)

**_Holly Cloonan, Ph.D._**:

Dr. Cloonan completed a form Psychiatric Review Technique on November 15, 2008, on which she opined that Claimant's learning disorder NOS, major depressive disorder, and anxiety disorder resulted in mild limitations in maintaining activities of daily living and social functioning; moderate limitations in maintaining concentration, persistence, or pace; and no episodes of decompensation each of extended duration. (Tr. at 755-68.) Dr. Cloonan concluded that Claimant was mostly credible but noted that the severity of her symptoms was not supported by the evidence,

---

symptoms or "some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994).

including her report of activities. (Tr. at 767.) For instance, Dr. Cloonan noted that Claimant indicated she was limited in social functioning but reported that she went to church and spent time with family and friends. (Id.) Furthermore, her therapist noted poor concentration at the most recent visit, but her concentration was sufficient such that she read the Bible and wrote in a journal. (Id.) Dr. Cloonan further noted that Claimant completed forms in detail and followed instructions well, despite her allegation of difficulty with written instructions. (Id.) Dr. Cloonan noted that Claimant had experienced then recent stresses regarding her father's death and financial difficulties, which would have contributed to her psychological symptoms. (Id.)

Dr. Cloonan also completed a form Mental RFC Assessment on which she opined that Claimant was moderately limited in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and respond appropriately to changes in the work setting. (Tr. at 769-71.) She concluded that Claimant was not significantly limited in her ability to function in all other categories. (Id.)

*Cardinal Psychological Services, LLC - L. Andrew Steward, Ph.D.:*

On April 6, 2009, Dr. Steward completed a psychological evaluation at the request of Claimant's attorney to aid in her claim for SSI due to depression and anxiety. (Tr. at 792-98.) Claimant reported that she was nervous and depressed most of the time; suffered panic attacks two to three times a week; was more anxious around crowds, children, and noise; was irritable and had a short fuse; had decreased memory and concentration for the past two years; had suicidal thoughts, but no plan or attempt; slept very little with pain and worry keeping her from sleeping well; had feelings of sluggishness, tiredness, and being run down; had a normal appetite, but a weight gain of

12

15 to 20 pounds in a couple of months; cried a lot; felt useless, worthless, helpless, and hopeless due to the lack of affection in her environment; had low self-esteem; had occasional visual and audible hallucinations; and had nightmares. (Tr. at 793-94.) Claimant stated that she spent most of her time at home and went out only for medical appointments. (Tr. at 794.) She did not have a driver's license as she was unable to pass the written portion of the driver's test. (Id.) She sometimes visited a friend, but did not belong to clubs or churches. (Id.) She stated that she lost interest in writing in her journal and did not have an interest in people or things. (Id.)

On mental status exam, Dr. Steward noted that Claimant was appropriately talkative, rapport was established easily, she tried diligently, her affect was constricted, her mood was consistently anxious and dysphoric, and she was oriented in all spheres. (Tr. at 793.) Claimant's thought content and organization were impoverished but not confused; there was no evidence of hallucinations, delusions, or paranoia; all memory functions were significantly depressed; and all mental functions including fund of information, judgment, abstract reasoning, ability to perform calculations, and attention and concentration were significantly depressed. (Id.)

Among the psychological tests Dr. Steward administered was the WAIS-III, which revealed a Verbal IQ of 62, a Performance IQ of 58, and a Full Scale IQ of 57. (Tr. at 795.) Regarding academic achievement, the WRAT-4 revealed that Claimant functioned at the second grade level in reading and spelling and at the first grade level in arithmetic. (Tr. at 796.) Other tests revealed severe anxiety and severe depression. (Id.) Dr. Steward noted that the results of the evaluation were valid and reliable. (Tr. at 793.) He diagnosed major depressive disorder, recurrent, severe without psychotic features; generalized anxiety disorder; learning disorder NOS, mild mental retardation,

and assessed a GAF of 48.[4] (Tr. at 797.) Dr. Steward noted that Claimant had several limitations including functioning overall in the mild mental retardation range, with gross deficits in thinking and reasoning abilities. (Id.) She also had a "plethora of medical problems," and suffered from anxiety, depression, and chronic pain syndrome. (Tr. at 797-98.) He opined that Claimant was "permanently and totally disabled from any type of gainful employment...for at least a year or more." (Tr. at 798.) He further opined that her prognosis was poor and that she required supervision in handling her financial affairs. (Id.)

On April 6, 2009, Dr. Steward completed a form Medical Source Statement of Ability to Do Work-Related Activities (Mental), on which he opined that Claimant had moderate to marked limitations in understanding, remembering, and carrying out instructions, and in interacting and responding to supervision, co-workers, the public, and work pressures and work settings. (Tr. at 800-803.) He opined that Claimant's mental impairments would cause her to be absent from work more than three times a month. (Tr. at 802.)

**_Gary Craft, M.D._**:

Dr. Craft completed a physical examination of Claimant on April 13, 2009, at which time he noted that Claimant reported visual and auditory hallucinations. (Tr. at 812-24.) On physical exam, Dr. Craft observed that Claimant was alert and cooperative. (Tr. at 813.) He noted that Claimant was "very well oriented, related well to other people and the gross mental status was intact." (Tr. at 815.) He was unable to detect any deterioration of personal habits and noted that she had a normal affect, memory, thought content, and general fund of knowledge. (Id.)

---

[4] A GAF of 41-50 indicates that the person has serious symptoms, or serious impairment in social, occupational or school functioning. American Psychiatric Association, _Diagnostic and Statistical Manual of Mental Disorders_ ("DSM-IV") 32 (4th ed. 1994).

***Jeff Harlow, Ph.D. - Psychiatric Review Technique***:

On March 25, 2009, Dr. Harlow completed a form Psychiatric Review Technique, on which he opined that Claimant's depressive disorder was not a severe impairment. (Tr. at 826-39.) He further opined that Claimant's mental impairment resulted in only mild limitations in maintaining activities of daily living, social functioning, concentration, persistence, and pace, and no episodes of decompensation each of extended duration. (Tr. at 836.) In reviewing the medical records, Dr. Harlow noted that all the comments about the functional capacities were externally inconsistent with the clinical results of the treating source, and therefore, were regarded as partially credible. (Tr. at 838.)

***WVU Department of Behavioral Medicine***:

**_Dr. Arashdeep Gill, M.D._**:

Claimant began treatment at WVU Department of Behavioral Medicine & Psychiatry on May 14, 2009, with Dr. Gill. (Tr. at 853-556.) Claimant reported that she had been depressed all her life, beginning in her teenage years. (Tr. at 853.) She reported poor sleep, poor energy, loss of interest, anhedonia, poor concentration, panic attacks that lasted fifteen to twenty minutes, some auditory and visual hallucinations, and nightmares and flashbacks. (Id.)

On mental status exam, Dr. Gill noted that Claimant was awake, alert, and oriented to time, place, person, and situation. (Tr. at 855.) She exhibited normal and focused speech, good eye contact, normal immediate and remote memory, a depressed mood and congruent affect, linear and goal-directed thought processes, fair insight and judgment, and concrete conceptual ability. (Id.) Claimant admitted to some auditory and visual hallucinations that began six months ago, she denied current suicidal or homicidal ideation, and her fund of knowledge was below average. (Id.)

Dr. Gill diagnosed generalized anxiety disorder with panic attacks; major depressive

15

disorder; post-traumatic stress disorder; and assessed a GAF of 60.[5] (Tr. at 855.) He ordered blood work, prescribed Minipress 1mg at nighttime for flashbacks and nightmares, and increased her Wellbutrin XL to 300mg for depression and anxiety. (Id.) He also continued her Oxazepam 10mg, twice daily for anxiety. (Id.)

### Dr. Maria Moran, Ph.D.:

On June 11, 2009, Dr. Moran conducted a neuropsychological evaluation to assess Claimant's cognitive functioning. (Tr. at 882-84.) Claimant reported a six month gradual worsening of cognitive difficulties, including short-term memory, concentration, distractibility, word-finding, comprehension, and slowed speed of thought. (Tr. at 882.) Claimant described her mood as "blah" and "down." (Id.) She reported reduced interest in activities, sleep, and appetite disturbance, and anxiety attacks. (Id.) She also reported auditory and visual hallucinations for the past four months and reported multiple stressors and difficulty coping effectively with stress. (Id.)

Dr. Moran noted that MRI of the brain on May 6, 2009, showed subtle signal abnormality in the right occipital subcoritcal region with overlying cortical abnormality. (Tr. at 857, 882.) Dr. Moran noted that the lesion remained on repeat imaging conducted on May 29, 2009, which suggested possible low-grade glial neoplasm. (Tr. at 882.)  Dr. Moran noted that Claimant was cooperative with the evaluation, that her affect was broad and appropriate, she was a good historian, she had good effort and attention to task, and there was no indication of embellishment of cognitive symptoms. (Tr. at 883.) Dr. Moran considered the results to be a valid indication of her current cognitive functioning. (Id.)

---

[5] A GAF of 51-60 indicates that the person has moderate symptoms, or moderate difficulty in social, occupational or school functioning. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994).

Dr. Moran noted that results of the evaluation indicated "cognitive deficits affecting visuospatial skills prominently, with additional difficulty with complex attention, visual memory, and reasoning and problem solving." (Tr. at 883-84.) She found the results were consistent with the MRI. (Tr. at 884.) She also noted that Claimant showed executive function deficits attributable to her significant psychiatric history. (Id.) She recommended continued psychiatric treatment and noted that Claimant's difficulty with reasoning and problem solving likely contributed to her difficulty coping with and managing stress. (Id.)

***Yadira Santiago, M.D. & James Stevenson, M.D.***:

On July 16, 2009, Claimant was examined by Drs. Santiago and Stevenson. (Tr. at 850-52.) She reported that her nightmares had decreased and that she experienced them occasionally. (Tr. at 851.) She reported that she slept on average four hours per night and felt tired most of the day. (Id.) She felt anxious and worried a lot and lacked any desire to attend church, but reported that she had more energy and felt more in control. (Id.) She denied any hallucinations since taking her medications with meals. (Id.) On mental status exam, Claimant had slow speech on occasion, good eye contact, an anxious mood and congruent affect, linear and goal-directed thought processes, good insight and judgment, and she was alert and oriented. (Tr. at 851-52.) She denied delusions or hallucinations and suicidal or homicidal ideations. (Tr. at 851.) Her medications were adjusted to help with her anxiety, depression, and nightmares. (Tr. at 852.)

Claimant's Challenges to the Commissioner's Decision

Claimant first alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in failing to discuss the opinion of Claimant's treating psychiatrist, Dr. Hasan. (Document No. 18 at 7.) Claimant states that the ALJ's only mention of Dr. Hasan's treatment failed to mention her name or her diagnoses, and certainly did not address her opinion.

17

(Id.) In response, the Commissioner asserts that the ALJ accurately summarized Dr. Hasan's medical records and was not required to discuss her "unsupported medical opinion that preceded the relevant time period for [Claimant's] SSI claims." (Document No. 21 at 10.) The Commissioner asserts that Claimant protectively filed her application for benefits in September 2008, and Dr. Hasan's opinion was dated July 12, 2007. (Id. at 11.) The Commissioner contends that Dr. Hasan's opinion therefore was not relevant. (Id.) Moreover, the Commissioner asserts that pursuant to 20 C.F.R. § 416.927(d), Dr. Hasan's opinion was a dispositive opinion not entitled to any special significance. (Id.) Finally, the Commissioner asserts that the ALJ explained that an opinion of disability was inconsistent with the record. (Id. at 11-12.)

Citing Boston v. Barnhart, 332 F.Supp.2d 879, 888 (D.Md. 2004), Claimant asserts in reply, that the ALJ had a duty not only to summarize the medical records, but to weigh and evaluate them, which the ALJ failed to do with respect to Dr. Hasan's opinion. (Document No. 22 at 1-2.) Claimant asserts that it is incredulous for the Commissioner to argue that an opinion of disability proffered by a treating psychiatrist fourteen months prior to the application date is irrelevant. (Id. at 2.) Claimant further asserts that although the opinion of disability is reserved to the ALJ, the ALJ did not advance that as a reason in his opinion for not considering Dr. Hasan's opinion. (Id. at 2-3.)

Claimant next alleges that the ALJ's decision is not supported by substantial evidence because the ALJ erred in four ways in giving little weight to Dr. Steward's opinion. (Document No. 18 at 7-9.) First, citing Wooldridge v. Bowen, 682 F.Supp. 864, 865 (W.D. Va. 1988), Claimant asserts that the ALJ erred in perceiving any basis for excluding a one-time examination arranged by counsel for enhancing an application for benefits. (Id. at 7.) Second, Claimant asserts that the ALJ erred in finding that Dr. Steward's RFC was unsupported by his minimal clinical findings when he administered six separate diagnostic tests that supported his conclusions. (Id. at 7-8.) Third,

Claimant asserts that the ALJ erred in finding that her sporadic and conservative treatment contradicted Dr. Steward's findings and provided his own opinion in making such a decision. (Id. at 8.) Fourth, Claimant asserts that the ALJ erred in finding that Dr. Steward's opinion was contrary to Ms. Nolley's GAF assessment of 70 in May 2010. (Id.) Claimant contends that a GAF score does not remain constant and is an estimate of functioning only at a particular time. (Id.) She further contends that the ALJ failed to acknowledge Dr. Steward's GAF of 48, which supported his RFC. (Id. at 9.)

In response, the Commissioner asserts that pursuant to 20 C.F.R. § 416.927, as the finder of the fact, the ALJ had the exclusive duty to evaluate the medical opinions. (Document No. 21 at 12.) Addressing each of Claimant's reasons, the Commissioner first asserts that single consultative examinations do not provide the insight of a longitudinal picture of a claimant's impairments, and therefore, fail to carry as much weight as long-term relationships. (Id. at 12-13.) The Commissioner distinguishes Wooldridge and asserts that in that case the court found that such reports were not barred from admission. (Id. at 13.) The Commissioner asserts that in this case, the ALJ did not exclude Dr. Steward's report, but merely discounted its weight. (Id.) Second, the Commissioner asserts that the ALJ's finding that Dr. Steward's opinion was not supported by his minimal clinical findings is supported by the record. (Id.) Third, the Commissioner asserts that the ALJ's finding that Dr. Steward's opinion was inconsistent with Claimant's sporadic and conservative treatment is supported by the record as there were gaps in Claimant's treatment history and she never was hospitalized due to her psychological issues. (Id. at 14.) Finally, the Commissioner asserts that the ALJ properly found that Dr. Steward's opinion was inconsistent with Ms. Nolley's GAF of 70, because she treated Claimant over a period of time, whereas Dr. Steward was a one-time examiner. (Id.)  In reply, Claimant asserts that contrary to the Commissioner's argument, the ALJ never

mentioned anything about Dr. Steward's report being inconsistent with his medical source statement. (Document No. 22 at 3.)

Finally, Claimant asserts that the ALJ's decision is not supported by substantial evidence because the ALJ erred in formulating his RFC because he relied on Dr. Cloonan's opinion. (Document No. 18 at 9-10.) Claimant asserts that Dr. Cloonan's opinion was rendered in 2008, prior to the production of the great majority of the treating psychiatric and psychological records. (Id. at 9.) She asserts that Dr. Cloonan neither had the benefit of the evaluations by the specialists at WVU Healthcare, nor Dr. Steward's psychological test results. (Id.) Citing Boswell v. Barnhart, Civil Action No. 1:02-00500 (S.D. W.Va. Sept. 30, 2003), Claimant asserts that relying on a DDS consultant who had the benefit of little evidence to review was improper.

In response, the Commissioner asserts that Claimant "wrongly contends that the ALJ relied exclusively on Dr. Cloonan's RFC assessment in formulating his RFC finding." (Document No. 21 at 14-15.) The Commissioner asserts that although the ALJ relied on Dr. Cloonan's opinion in finding that Claimant did not meet a listing impairment at step three of the sequential analysis, he failed to mention her in formulating Claimant's RFC. (Id. at 15.) The Commissioner asserts that instead, the ALJ discussed Claimant's hearing testimony, treatment notes, Claimant's daily living activities, and Dr. Steward's one-time consultation in formulating his RFC. (Id.) The Commissioner further states that Boswell is distinguishable because Dr. Cloonan had over one year's worth of treatment notes before her, the agency obtained two independent assessments after Dr. Cloonan's assessment, and the ALJ relied on all the record evidence in formulating his RFC. (Id.)

Claimant asserts in reply that the Commissioner seems to approve of Dr. Cloonan's review of almost entirely pre-application evidence when he criticized Dr. Hasan's opinion of disability because it was pre-application. (Document No. 22 at 4.) Furthermore, Claimant asserts that although

Dr. Harlow later found no serious mental impairment, which was contradictory to Dr. Cloonan, the ALJ failed to mention Dr. Harlow's opinion in his decision.

Claimant also has moved for remand on the basis of new and material evidence. (Document No. 19.) Claimant asserts that a neuropsychological evaluation performed by Dr. Maria Moran on June 11, 2009, was not acknowledged by either counsel or the ALJ, although the records were submitted to the ALJ. (Document No. 20 at 1.) Claimant asserts that the oversight was discovered on appeal and asserted that the results of Dr. Moran's evaluation explained many aspects of the case regarding Claimant's cognitive functioning. (Id.) Claimant further asserts that Dr. Moran's findings corroborate Dr. Steward's findings on "almost every front." (Id. at 2.) She explains that Drs. Moran and Steward appreciated Claimant's severe restrictions regarding memory and comprehension, and Dr. Moran explained her significantly lowered IQ in 2009, as opposed to her formative years. (Id.) Claimant asserts that the evidence is "critical to a reasoned evaluation" of her claim and should have been a part of the original record. (Id.)

In response, the Commissioner asserts that Claimant cannot establish good cause for failing to present the evidence earlier because it was presented, but she failed to notice the reference. (Document No. 21 at 15-16.) The Commissioner also asserts that the evidence is not material because, as Claimant admits, the evidence merely repeats Dr. Steward's extreme findings, which the ALJ found were unsupported by the record. (Id. at 16.) Furthermore, the Commissioner asserts that Dr. Moran found that "[d]espite the significance of her visuospatial deficits, there does not appear to be any associated functional interference." (Id.)

In reply, Claimant asserts that the evidence was inadvertently omitted from documents received from a well known research center, which confirmed a brain lesion that significantly impacted cognitive skills. (Document No. 22 at 5.) Claimant asserts that the test explained the

21

discrepancy in IQ testings, the etiology of many of her complaints, and corroborated Dr. Steward's psychological tests that were ignored by the ALJ. (Id.) Claimant asserts that the evidence should be considered. (Id.)

Analysis.

Claimant alleges that the ALJ erred in failing to analyze or even mention Dr. Hasan's opinion. (Document No. 18 at 7.) Opinions on a claimant's Residual Functional Capacity are issues that are reserved to the Commissioner. The Regulations state that:

> We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity . . . or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

See 20 C.F.R. § 416.927(e)(2) (2010).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The Regulations state that opinions on these issues are not medical opinions as described in the Regulation dealing with opinion evidence (20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2)); rather, they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e) and 416.927(e). For that reason, the Regulations make clear that "[w]e will not give any special significance to the source of an opinion on issues reserved to the Commissioner. . . ." Id. §§ 404.1527(e)(3) and 416.927(e)(3). The Regulations further provide that "[f]or cases at the Administrative Law Judge hearing or Appeals Council level, the responsibility for deciding your residual functional capacity rests

with the Administrative Law Judge or Appeals Council." See 20 C.F.R. §§ 404.1545 and 416.946 (2010). However, the adjudicator must still apply the applicable factors in 20 C.F.R. § 416.927(d) when evaluating the opinions of medical sources on issues reserved to the Commissioner. See Social Securing Ruling ("SSR") 96-5p, 61 FR 34471, 34473 (1996).

Social Security Ruling 96-5p makes a distinction between an RFC assessment, which is "the adjudicator's ultimate finding of 'what you can still do despite your limitations,'" and a "'medical source statement,' which is a 'statement about what you can still do despite your impairment(s)' made by an individual's medical source and based on that source's own medical findings." Id. SSR 96-5p states that "[a] medical source statement is evidence that is submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge, while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the other evidence in the case record about what an individual can do despite his or her impairment(s)." Adjudicators "must weigh medical source statements under the rules set out in 20 C.F.R. § 416.927, providing appropriate explanations for accepting or rejecting such opinions." Id. at 34474.

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2010). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to

treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2010). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2010). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2010). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2010). Ultimately, it is the responsibility of the

24

Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).

Claimant correctly notes that the ALJ failed to mention, let alone analyze Dr. Hasan's July 18, 2007, opinion. The ALJ's only mention of Dr. Hasan's continuing treatment of Claimant consisted of a single paragraph, consisting of three sentences, that summarized hers and Ms. Nolley's progress notes prior to April 7, 2009. (Tr. at 18.) To the ALJ's credit, Dr. Hasan's handwriting was difficult to decipher and her progress notes consisted of pre-printed forms on which she indicated either by check mark or few words Claimant's mental condition. The notes overall consistently indicated depressed or anxious mood and affect and poor concentration and memory but otherwise were not significant for deficiencies in mental status or condition.

Pursuant to 20 C.F.R. § 416.927(b) and (c), an ALJ is obligated to consider and evaluate the medical opinions together with all relevant evidence. From the face of the ALJ's decision in the instant case, he failed to consider or evaluate Dr. Hasan's opinion. Though the ALJ may have found the opinion irrelevant as the Commissioner argues, he did not state that as a basis for summarily disregarding the opinion. To the extent that any irrelevancy argument is applicable, the Court finds that such argument is inconsistent with the ALJ's application of Dr. Cloonan's opinion at step three of the sequential analysis. With the exception of the report of the October 20, 2008, mental status examination by Ms. Nolley, Dr. Cloonan considered evidence that pre-dated the filing of Claimant's

25

application for benefits. The Court agrees with Claimant and finds that the ALJ may not disregard one treating opinion because it was irrelevant as it pre-dated her application by nearly fourteen months, as the Commissioner asserts, but rely primarily on another opinion at step three of the sequential analysis when that opinion was rendered essentially on only evidence that pre-dated her application date. See Fraley v. Astrue, 2009 WL 577261, *27 (N.D. W.Va. Mar. 5, 2009)(overruling the Commissioner's argument that a medical opinion predated the claimant's alleged onset date and therefore, was irrelevant, and remanding the case as the ALJ erred in his duty to consider all medical opinions). The ALJ may not cherry pick the evidence and summarily disregard any medical opinion he chooses, especially the opinion of Claimant's treating psychiatrist. The Commissioner further argues that Dr. Hasan's opinion was a dispositive opinion not entitled any special significance. Though that may be the ALJ's decision on remand, "it is not within the province of a reviewing court to determine the weight of the evidence." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

Accordingly, the Court finds that this matter must be remanded for consideration of all the opinion evidence of record. The undersigned therefore, needs not address specifically Claimant's remaining arguments. On remand, the ALJ will have to consider all the evidence of record, including the opinion evidence, and therefore, Dr. Steward's and Dr. Harlow's opinions and Dr. Moran's evaluation will be considered again.

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Judgment on the Pleadings (Document No. 16.) is **GRANTED**, Plaintiff's Motion for Remand (Document No. 19.) is **DENIED as moot**, Defendant's Motion for Judgment on the Pleadings (Document No. 21.) is **DENIED**, the final decision of the

Commissioner is **REVERSED**, and this matter is **REMANDED** to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings and is **DISMISSED** from the active docket of this Court.

.       The Clerk of this Court is directed to send a copy of this Memorandum Opinion to counsel of record.

      ENTER: September 30, 2013.

R. Clarke VanDervort
United States Magistrate Judge